# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| KELLEY STARK, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:22-CV-02579-E |
| | § | |
| EDWARDS LIFESCIENCES LLC, | § | |
| | § | |
| Defendant. | § | |
| | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Edwards Lifesciences LLC (Edwards)'s motion for summary judgment, which seeks dismissal of all of Plaintiff Stark's claims. (ECF No. 39). Additionally, the Parties have filed various ancillary motions that relate to this motion for summary judgment. Edwards has moved to strike Stark's summary judgment evidence. (ECF No. 47). Edwards has moved for sanctions on Stark. (ECF No. 50). Stark has moved for leave to file a sur-reply. (ECF No. 52). After considering the Parties' briefing, appendices, and applicable law, the Court adjudicates these motions as follows.

For the reasons hereunder, the Court:

1. GRANTS Edwards's motion for summary judgment, (ECF No. 39);

2. DENIES Edwards's motion to strike, (ECF No. 47);

3. DENIES Edwards's motion for sanctions, (ECF No. 50); and

4. DENIES Stark's motion for leave to file sur-reply, (ECF No. 52).

## I.    BACKGROUND

### A.  Edwards and Stark

Edwards is a company that sells, *inter alia*, surgical heart valves. In 2003, Edwards hired Stark to sell its products. (ECF No. 41 at 11-13). Stark's job title changed over time, but her primary job duty was to promote the sale of Edwards's medical devices. (ECF No. 41 at 15-18).[1] Edwards's job description included requirement(s) that Stark "promote[] the products and services of the surgical structural heart division and educate[] customers on the safe and effective use of those devices." (ECF No. 41 at 17). Stark agreed her job duties included (i) executing sales strategies and direct sales of products to customers and (ii) interacting with the entire operating room staff. (ECF No. 41 at 11-12). With regard to her job duties and interactions with customers, Stark testified that "there's a lot more that goes into [the role]" beyond the duties enumerated in her job description. (ECF No. 41 at 12). Stark was expected to grow business with her customer accounts. (ECF No. 41 at 14).

Stark testified she "called on surgeons in their offices and in the hospitals and [. . .] basically educate[d] any of the personnel staff [and] spen[t][] time and build[t] the relationships with the cardiac surgeons." (ECF No. 41 at 17). Stark testified she educated hospital staff through "in-services," which she explained:

> In-service would be on the nursing staff; it's their responsibility to get a product ready to hand off to the surgeon for him to implant. So there would be meetings set up with that staff to -- staff to go through exactly how the device is prepared and ready for the surgeon to use. And then, of course, educate the -- I didn't have to educate the surgeon on, obviously, how to practice medicine, but the implantation of our devices and the correct use of our devices.

---

[1] This is the second-filed of two employment cases that involve a plaintiff that sold medical devices for Edwards. *See Washington v. Edwards Lifesciences LLC*, No. 3:22-cv-02565-E.

(ECF No. 41 at 18). Stark presented these educational services both in the hospital and offsite. (ECF No. 41 at 18).[2] Edwards required its salespersons—including Stark—to meet with customers both outside and inside hospital settings. (ECF No. 41 at 50; 102-03; 144). For sales representatives, meeting with customers inside of the hospital setting was an essential role of the job. (ECF No. 41 at 102-03, 144). Stark agreed that it was important for her job to enter customer hospitals. (ECF No. 41 at 50). Edwards's Senior Vice President of Sales and Commercial Operations Jim Mayberry testified that Stark's role involved in-person and in-hospital visits as essential to the job. (ECF No. 41 at 103).

### B.  Edwards's COVID-19 Mandate

In the summer and fall of 2021, a new variant of COVID-19—the Delta variant—circulated throughout the United States. (ECF No. 41 at 115-16, 123, 147).[3] Edwards's Senior Vice President for Global Employee Health Dr. Tista Ghosh determined that this:

> Delta variant was causing more severe illness, particularly among the types of high-risk patients that Edwards treats. In addition, the Delta variant was found in a July 2021 study to be more contagious, reducing exposure time necessary to spread infection from minutes to seconds. In addition, an August 2021 study found that people had double the hospitalization risk with Delta than they did with the previously dominant variant.

(ECF No. 41 at 115). In response, Edwards implemented a COVID-19 mandate, which involved vaccination or testing. Ghosh testified during her deposition that:

> We have the highest risk patients, and they all were at risk of potentially dying from COVID at that point. So we made this policy for people who potentially interacted with patients or went into hospital facilities, because our goal was to protect patients at that time.
> [. . .]

---

[2] Stark testified that her educational services with customers occurred in the hospital "[n]inety-five percent of the time. (ECF No. 41 at 18).

[3] *See generally Alabama Ass'n of Realtors v. Dep't of Health & Human Services*, 594 U.S. 758, 772 (2021) (Breyer, J., dissenting) (discussing that the "Delta variant is more than 2x as contagious as previous variants" and may "cause more severe illness than previous strains in unvaccinated persons") (internal quotation omitted).

---

MEMORANDUM OPINION AND ORDER

[][D]uring that timeframe, we were still learning about a new variant called the delta variant[,] which had just come out that summer. And it was different. It was very different from the previous variants. And it was more contagious we were learning. We didn't have a full picture at this point.

(ECF No. 41 at 123). On August 30, 2021, Edwards issued the following Mandate in response to

the Delta variant of COVID-19:

> ***After careful consideration, we have decided that all patient-facing and in-hospital employees and contingent workers must receive all required COVID vaccine doses[] by October 1 2021. This definition includes anyone who directly interfaces with patients and those who enter a hospital or healthcare facility as a part of their role.*** *Examples include*, but are not limited to, *sales representatives*, clinical specialists, and members based at an Edwards facility who enter hospitals to support R&D, engineering and clinical projects.
> [. . . .]
> This vaccination requirement does not apply to employees and contingent workers in countries where it is prohibited by law to impose vaccination. *In countries like the United States, where vaccine requirements are permissible, reasonable accommodation will be provided for those who are unable to receive a COVID vaccine because of qualifying medical or religious reasons.*
>
> In countries where vaccines are less available, or other requirements exist, our regional leaders and HR Business Partners will work with managers to institute alternate measures that optimize patient safety and healthcare provider safety, *which may include regular COVID testing or specific masking requirements.*

(ECF No. 41 at 147) (emphasis added in italics and bold italics). It is undisputed that this Mandate

applied to Stark. (ECF No. 41 at 22). In response to this Mandate, Stark requested a religious

accommodation. Stark declined a COVID-19 vaccine and nasal PCR testing explaining "I cannot

take a vaccine and submit to invasive PCR testing because these protocols are poorly aligned with

my personal, Christian beliefs." (ECF No. 41 at 25). Stark testified to her objections to COVID-

19 vaccination and PCR testing:

> You know, I'm one of those people that I believe every single word in the Bible is true; every last bit. Jonah was swallowed by a whale. Every last bit. My body, I've been taught, is a temple, and that God dwells within that temple. And that him that shall defile the temple of God, him, God, will destroy. And so it is -- it is my heart and soul that -- that I honor that. And I'm not going to shove something up to my brain that I have -- I'm not going to do that anyway. And then, B, I don't know

what in the world is on that, and I'm sure not going to do that. I'm not going to shove -- shove a blank Q-tip, and I'm surely not going to shove a Q-tip that's got no telling what on it up my nose. Not doing it.

[. . . .]

God gave me a brain. God gave me critical thinking. You know, the minute all this started -- started being discussed it was my understand this was a completely different platform. This was -- there's all sorts of clinical reasons that made me question. But again, Edwards -- Edwards taught me how to read data. Edwards taught me how to look at a product insert. I -- I physically looked at the product insert and it was blank. You want me to inject something in my body I have no -- you won't tell me what's in there, you haven't studied it, you've totally dismantled the control group. It takes years to develop a vaccine. And oh, by the way, now, it's my understanding that we're going to mess with your DNA. We're going to -- we're going to mess with the design that God gave me, and I'm going to try and rewrite what he did? That is -- that is so antithetical to how I was raised, to what I believe. And I honestly attribute that to the Holy Spirit saying, "That is not going to work. You're -- you can't do that. It does not matter the cost; you cannot do that. You cannot dishonor -- you just can't dishonor God that way."

(ECF No. 41 at 26-27). In the past, Stark submitted to several flu and other vaccinations. (ECF No. 41 at 157). Stark testified she did not know "what all those are because I just got them because I guess I needed them. I don't know." (ECF No. 41 at 79-80).

On September 30, 2021, Edwards granted Stark's accommodation—requiring her to (i) wear an N95 mask while in a hospital or around patients of physicians, (ii) submit to twice-weekly saliva PCR tests, and (iii) complete a twice-monthly account tracking for her assigned customers' COVID-19 vaccination policies—including whether she had secured a COVID-19 vaccination exemption from those customers. (ECF No. 41 at 35, 158-62). Edwards's accommodation explains:

while we can grant you this accommodation, if the accounts in your region begin to mandate the vaccine and *therefore your access to your accounts is restricted, we will need to reconnect to explore what options are available at that time.*

(ECF No. 41 at 158) (emphasis added); (*see also* ECF No. 41 at 36-37) (discussing the same). This accommodation persisted until Stark's last day of employment. (ECF No. 41 at 168).

### C.  Customer COVID-19 Policies, Further Accommodation, and Discharge

On September 30, 2021, only one of Stark's customer accounts had a COVID-19 vaccine mandate that did not allow for any exemptions. (ECF No. 41 at 36). On October 15, 2021, Stark notified Edwards that seven of her 32 assigned customer hospitals were (i) implementing their own COVID-19 vaccination mandates and (ii) disallowing any COVID-19 vaccination exemptions. (ECF No. 41 at 124-27). On October 22, 2021, Stark met with her supervisor, Joe Constantino, and Edwards's Senior Manager of Human Resources Marie Burgos about these changes from Stark's assigned customer hospitals. (ECF No. 41 at 176). By email memorandum after the discussion, Burgos explained:

> As we spoke about, we did allow you to continue in your role with your requested religious exemption, subject to N95 and PCR testing twice a week.
>
> ***Unfortunately, now multiple additional accounts have decided not to allow exemptions to COVID-19 vaccination, making up about 25% of your territory. Because of this changed landscape and your inability to get into so many of your accounts without the vaccine, it would be an undue hardship for us to accommodate you in your current role past November 15th, 2021.***
>
> ***We spoke about looking at different potential roles that are open and that would be a good fit. As agreed, let's speak early next week to go over your skills, interest and different current openings. In the meantime, please look at different roles within Edwards that could be a fit and let me know if you see anything you are interested in.*** I am providing the link to open jobs: https://edwards.wd5.myworkdayjobs.com/en- US/EdwardsCareers
>
> If you are not interested or do not see other roles that you want to consider, we will need to move forward with separation of employment effective November 15th, 2021.

(ECF No. 41 at 176) (emphasis added in bold italics). Stark understood that she "was given the option if [she] was not willing to go and take the [COVID-19 vaccine] that [she] could look for other roles that did not require the vaccine." (ECF No. 41 at 51).

Stark testified that she sought for other roles that did not require the vaccine. (ECF No. 41

at 51-52). Stark explained:

> Again, I -- I left no stone unturned. I even had a conversation just to buy some time.
> Okay. Well, what if I -- what if I agree to retire? I will help train somebody thinking
> that, okay, well then, you know, it's changing all this time if the courts rule, they'll
> want to keep me. Because my golly, I've certainly done a good job for them[.]

(ECF No. 41 at 53). As an alternative accommodation Stark proposed the following to Edwards

on October 22, 2021:

> I would like to assist during the transition to ensure that the path forward is a smooth
> one. I propose that I announce my retirement, effective January 1, 2022, and
> continue to service my accounts professionally and legally until that time.
> The intervening weeks will allow you to find the appropriate replacement. Once
> that individual is in place, I will gladly facilitate introductions to key surgeons and
> hospital personnel.

(ECF No. 41 at 193). Burgos explained that a resignation would be irrevocable; on November 2,

2021, Stark withdrew her resignation proposal. (ECF No. 41 at 53, 192). On November 2, 2021,

Burgos again emailed Stark:

> I wanted to confirm that due to your inability to get into so many of your accounts
> without the COVID- 19 vaccine, it would be undue hardship for us to accommodate
> you in your current role past November 15th, 2021.
>
> In the meantime, please continue to look at different roles within Edwards that
> could be a good fit and let me know if you see anything you are interested in. I'd
> love to also chat about your interest, relocation availability, etc. to try to help you
> out in the process. Here is the link to open jobs:
> https://edwards.wd5.myworkdayjobs.com/en-US/EdwardsCareers
>
> As a reminder, If you are not interested, do not see other roles that you want to
> consider, or if hospitals do not change their policies, we will need to move forward
> with separation of employment effective November 15th, 2021.

(ECF No. 41 at 192).

Stark did not identify any roles to which she was interested in transferring because she "did

not feel like, at that point, [Edwards was] operating in good faith." (ECF No. 41 at 53). On

November 10, 2021, Burgos again emailed Stark "[p]lease let me know if you would like to speak this week about potential other roles at [Edwards] that would be a good fit for you." (ECF No. 41 at 192).

On November 14, 2021, Stark proposed an accommodation wherein a different employee—Drew Johnson, a clinical specialist who worked in a different region—would assume her roles with five of the seven customer accounts that were implementing COVID-19 vaccination policies. (ECF No. 41 at 19-21, 197). Under this proposed accommodation, Stark would "oversee" and "coach" Johnson while Johnson performed the work Stark previously handled. (ECF No. 41 at 197). Stark offered no solution as to the remaining two of the seven customer accounts that were implementing COVID-19 vaccination policies. (ECF No. 41 at 48-49, 197). Stark did not know if Johnson was qualified to hold Stark's job title or responsibilities. (ECF No. 41 at 49). Stark testified that a clinical specialist—like Johnson—was:

> basically a junior sales rep someone brought on board to be able to shadow a sales rep and learn -- be able to support -- do case support, rep support, be able to learn the job so that hopefully if they ever need -- if a territory opens up or if a territory splits or if there's growth that there's a bench that provides people that have been trained on Edwards -- the Edwards company, the Edwards products that can step into that role. It's a -- it's a development role.
> [. . . .]
> it's clinical in nature, but yes, it's a -- it is a training ground for them to be able to -- it's a pathway to be able to become a sales rep.

(ECF No. 41 at 19-20). Edwards evaluated this proposal. Edwards's Vice President of Sales for the West Jon Bostelman testified:

> Drew could deliver product, yes, but he's not in a position from a tenure standpoint to try and clinically sell or have an impact or be successful in that forum given his tenure and scope of how long he's been at Edwards.
> [. . . .]
> [I]f you cannot go in and oversee a junior sales rep as they're interacting with surgeons, like physically in the building, it's not setting that person up to be successful.
> [. . . .]

> I believe that having a general inexperienced rep, especially in an [Operating Room] theater, being, you know, either coached remotely or previously coached or anything like that when there is a patient on the table or, you know, we're tasked with coaching and educating the staff the safe and efficacious use of our products. Putting a little bit more inexperienced person in that situation could create some risk.

(ECF No. 41 at 139-40). Bostelman explained that if an Edwards device "is used improperly [. . .] it could [cause a risk of] patient death." (ECF No. 41 at 145).

Edwards considered assigning Stark's seven customer accounts to another employee but could not find a suitable employee to take on those accounts. (ECF No. 41 at 140-46). On November 15, 2021, Mayberry explained the following in discharging Stark:

> Thanks for your email. I appreciate that you are looking for creative solutions, but unfortunately your proposed solution is not workable for the business and would result in an undue burden.
>
> As you know, the accounts you are currently unable to enter comprise more than 25% of your current business but are also some significant upside and growth opportunities. These opportunities will become even greater in the mitral space in the coming months after the pending regulatory clearance of MITRIS. Your role as Senior Cardiovascular Specialist is not just to maintain the current status quo in your accounts; it is also to identify new business opportunities within those accounts and grow them to their full potential. The ability to enter these accounts to maintain and increase business is an essential function of your role.
>
> If there was another sales rep in your area that could enter these accounts, we would certainly consider whether we could shift the territory to enable you to remain in your role. Unfortunately, there is not. Your solution of having Drew cover these accounts is simply not possible - the therapy specialist role is a collaborative role with the sales reps and does not have the proper experience to cover accounts on their own (nor is that the intended purpose of the role). Further, they are strategically placed into accounts based on business need across the region, not just one territory.
>
> Therefore***, given that you were not interested in looking at other potential roles within Edwards, we are no longer able to accommodate your religious exemption to the COVID vaccine without an undue burden. As planned, today will be your last day with Edwards.*** We wish you only the best in your future endeavors.

(ECF No. 41 at 196) (emphasis added in bold italics).

---

MEMORANDUM OPINION AND ORDER                                        Page **9** of **36**

### D. Procedural History

Stark initiated this litigation on November 16, 2022. (ECF No. 1). As amended, Stark asserted the following claims against Edwards: (i) religious discrimination, religious harassment, and religious retaliation in violation of Title VII and (ii) age discrimination and age-discrimination-retaliation in violation of the Age Discrimination in Employment Act (ADEA). (ECF No. 33 at 10-13). On June 5, 2023, the Court entered an order that instructed the Parties to take note of the Court's to-be adopted policies and procedures—effective July 1, 2023, and with hyperlinked attachment. (ECF No. 15). The Court promulgated its adopted policies and procedures by standing order on the Court's website on July 1, 2023. Both the hyperlinked attachment from June 5, 2023, and the July 1, 2023, adopted policies and procedures on the Court's website contain specific instructions regarding briefing requirements.

On March 11, 2024, Edwards filed its motion for summary judgment, which seeks dismissal of all of Stark's claims. (ECF Nos. 39-41). On April 1, 2024, Stark responded to the motion for summary judgment. (ECF Nos. 44-46). In her response, Stark "voluntarily [withdraws] her claims for age discrimination and retaliation[;] [. . .] the sole remaining issues are [] Stark's claim for violations of Title VII for disparate treatment and a failure to accommodate sincerely held religious beliefs and religious discrimination." (ECF No. 45 at 10).[4] Therefore, **all of Stark's claims—apart from her religious discrimination[5] and failure to accommodate religious observance claims are DISMISSED.** Edwards replied on its motion for summary judgment. (ECF No. 48).

---

[4] Although Stark's pleading states "religious harassment" in line wither her Title VII claims, Stark does not brief this assertion at any time in response to Edwards's motion for summary judgment, which seeks dismissal of all claims. In light of her concession and complete lack of briefing, the Court determines Stark has withdrawn or abandoned her claim of "religious harassment." (ECF No. 45 at 10).

[5] The Court addresses disparate treatment based on religion and religious discrimination, hereunder.

---

The Court first addresses its concerns regarding Stark's briefing, (ECF Nos. 44-46). Thereafter, the Court addresses Stark's remaining claims of (i) disparate treatment based on religion; (ii) religious discrimination; and (iii) failure to accommodate religious observance. Last, the Court discusses the various non-dispositive motions.

## II.    POLICIES, PROCEDURES, AND IMPROPER FILINGS

Federal courts are vested with the inherent power "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *See Link v. Wabash R. Co.*, 370 U.S. 626, 630-31 (1962). This authority is necessarily incident to the judicial power granted under Article III of the Constitution and includes the power of the court to control its docket. *See Woodson v. Surgitek, Inc.*, 57 F.3d 1406, 1417 (5th Cir. 1995). The Court's policies and procedures state under the Motion Practice heading: "[l]imit footnotes to only explanatory statements and dicta." (*See* ECF No. 14); Procedures for Cases Assigned to District Judge Ada Brown and Standing Order, (January 10, 2025), https://www.txnd.uscourts.gov/judge/judge-ada-brown. The Court recognizes these policies and procedures—adopted by standing order—as a means of docket control.

As briefed, Stark's response to Edwards's motion for summary judgment, (ECF No. 45), uses *only* footnote citations for virtually all citations[6] to both law and the respective appendix. Stark has failed to comply with the Court's policies and procedures—standing order. As a consequence, the Court shall not consider those filings—(ECF Nos. 44-46)—as properly filed. The Court shall not consider Stark's improperly filed briefing response to Edwards's summary judgment challenges. (ECF No. 45). The Court declines to offer Stark leave to refile the same. The Court DENIES Stark's motion to file sur-reply as moot. (ECF No. 52).

---

[6] Stark's response to Edwards's motion for summary judgment contains 163 footnote citations. (ECF No. 45).

### III.    SUMMARY JUDGMENT LEGAL STANDARD

Summary judgment is appropriate when the pleadings and evidence on file show "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. A court must view all evidence and draw all reasonable inferences in the light most favorable to a party opposing a summary judgment motion. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). A court "may not make credibility determinations or weigh the evidence" in ruling on the motion. *Reeves*, 530 U.S. at 150; *Anderson*, 477 U.S. at 254-55. Moreover, the evidence the nonmovant provides must raise "more than . . . some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). The evidence must be such that a jury could reasonably find in the nonmovant's favor. *Anderson*, 477 U.S. at 248. If the nonmovant is unable to make such a showing, the court must grant summary judgment. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

The moving party bears the initial burden of showing the court there is no genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party with the burden of proof on an issue "must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis omitted). When, as here, a nonmovant bears the burden of proof, the movant may demonstrate it is entitled to summary judgment either by (i) submitting evidence that negates the existence of an essential element of the nonmovant's claim or affirmative defense, or (ii) arguing there is no evidence to support an essential element of the nonmovant's claim or affirmative

defense. *Celotex*, 477 U.S. at 322–25. There is "no genuine issue as to any material fact [if] a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

Once the movant has made this showing, the burden shifts to the nonmovant to establish there is a genuine issue of material fact so that a reasonable jury might return a verdict in its favor. *Celotex*, 477 U.S. at 324. "[C]onclusory allegations, speculation, and unsubstantiated assertions" will not satisfy the nonmovant's burden. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1). A court "resolve[s] factual controversies in favor of a nonmoving party . . . only when an actual controversy exists, that is, when both parties have submitted evidence of contradictory facts." *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir. 1999).

"A party opposing such a summary judgment motion may not rest upon mere allegations contained in the pleadings, but must set forth and support by summary judgment evidence specific facts showing the existence of a genuine issue for trial." *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citing *Anderson*, 477 U.S. at 255–57). The Fifth Circuit has explained:

> The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim. . . . "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915–16 & n. 7 (5th Cir.), *cert. denied*, 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992).

*Ragas*, 136 F.3d at 458.[7] Regarding assertions of fact, Federal Rule of Civil Procedure 56 states:

> [i]f a party fails ... to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . (2) consider the fact undisputed for purposes of the motion [and] (3) grant summary judgment if the motion and supporting

---

[7] As a consequence of Stark's improper briefing, (ECF No. 45), the Court declines to "sift through" her corresponding appendix, (ECF No. 46). *See Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

materials—including the facts considered undisputed—show that the movant is entitled to it[.]

Fed. R. Civ. P. 56(e)(2)-(3).

At the outset, the Court acknowledges that Edwards's briefing as to Stark's religious discrimination claim is confusing. (*See* ECF No. 40 at 34-41). However, this is because it is unclear from Stark's Amended Complaint whether she plead (i) solely a claim of religious discrimination, or (ii) a claim of disparate treatment based on religion, or (iii) both as independent claims. (*See* ECF No. 33 at 11-12). As briefed, Edwards discusses religious discrimination under both contexts; Edwards briefs disparate treatment first, then (as subsumed) briefs religious discrimination. (*See* ECF No. 40 at 34-41). Therefore, the Court addresses (i) disparate treatment based on religion, (ii) religious discrimination, and (iii) pretext, which is common to both of those claims. The Court thereafter addresses Stark's failure to accommodate religious observance claim. (*See* ECF No. 40 at 41-52).

### IV. RELIGIOUS DISCRIMINATION - DISPARATE TREATMENT BASED ON RELIGION

"A plaintiff can prove a claim of intentional discrimination by either direct or circumstantial evidence." *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000); *see*, *e.g.*, *Gaalla v. Brown*, 460 F. App'x 469, 479 (5th Cir. 2012) (addressing racial discrimination). Regarding direct evidence, the Fifth Circuit has explained:

> Direct evidence [of discriminatory intent] is evidence which, if believed, proves the fact without inference or presumption.... It includes any statement or document which shows on its face that an improper criterion served as a basis—not necessarily the sole basis, but a basis—for the adverse employment action.

*Gaalla*, 460 F. App'x at 479 (internal quotations omitted). Here, Stark presents no direct evidence on any of her claims. "Absent direct evidence of discriminatory intent, as is typically the case, proof via circumstantial evidence is assembled using the framework set forth in the seminal case

of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Russell*, 235 F.3d at 222. Circumstantial evidence includes statements that merely suggest discriminatory motive or require the fact finder to draw an inference as to whether the comment is probative of an employer's discriminatory animus. *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 896-98 (5th Cir. 2002), *cert. denied*, 539 U.S. 926 (2003). The Fifth Circuit has explained the three-step *McDonnell Douglas* framework as follows:

> Under that framework, [a plaintiff] must make out a prima facie case of discrimination. *Watkins v. Tregre*, 997 F.3d 275, 281 (5th Cir. 2021). If she succeeds, [a defending employer] must respond with a "legitimate, nondiscriminatory reason" for terminating [the plaintiff]. *Id.* at 282. Then the burden shifts back to [the plaintiff], who must counter with substantial evidence that [the defending employer's] proffered reason is pretextual. *Id.*

*Owens v. Circassia Pharms., Inc.*, 33 F.4th 814, 825 (5th Cir. 2022). The second step of the *McDonnell Douglas* framework requires an employer's *production* of a legitimate, nondiscriminatory reason for terminating a plaintiff, but this second step "can involve no credibility assessment." *Reeves*, 530 U.S. 133, 142 (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993)).[8] Regarding the third step of the *McDonnell Douglas* framework, "the plaintiff can rely on evidence that the employer's reasons were a pretext for unlawful discrimination." *Russell*, 235 F.3d at 222 (citing *McDonnell Douglas*, 411 U.S. at 804).

A plaintiff may assert a claim for religious discrimination under a disparate treatment theory. The Fifth Circuit has explained:

> *"**Disparate-treatment discrimination addresses employment actions that treat an employee worse than others based on the employee's** race, color, **religion**, sex, or national origin. In such disparate-treatment cases, proof and finding of discriminatory motive is required." Pacheco v. Mineta*, 448 F.3d 783, 787 (5th Cir.

---

[8] Although intermediate evidentiary burdens shift back and forth under this framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 143 (2000) (quoting *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)).

2006). A plaintiff can prove discriminatory motive through either direct or circumstantial evidence. *Portis v. First Nat'l Bank of New Albany, Miss.*, 34 F.3d 325, 328 (5th Cir. 1994). When a plaintiff builds a case on circumstantial evidence, a court analyzes the plaintiff's claim under the *McDonnell Douglas* framework. *See Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003). "Under this framework, the plaintiff must first create a presumption of discrimination by making out a prima facie case of discrimination." *Id.*

*Cicalese v. Univ. of Tex. Med. Branch*, 924 F.3d 762, 766 (5th Cir. 2019) (emphasis added in italics and bold italics). For a plaintiff to meet the prima facie step of a disparate treatment claim, the Fifth Circuit requires a plaintiff to show:

he or she was: **(1)** a member of a protected class; **(2)** qualified for the position held; **(3)** subject to an adverse employment action; and **(4)** treated differently from others similarly situated. *Rios v. Rossotti*, 252 F.3d 375, 378 (5th Cir. 2001).

*Abarca v. Metro. Transit Auth.*, 404 F.3d 938, 941 (5th Cir. 2005) (emphasis added in bold) (addressing disparate treatment in race or national origin context); *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 513 (5th Cir. 2001) (addressing disparate treatment claim in race or national origin context).

Edwards challenges only the fourth element of Stark's prima facie disparate treatment claim—whether a genuine issue of material fact exists to show Stark was treated differently from others similarly situated. (ECF No. 40 at 37-40). The Fifth Circuit has discussed this fourth element:

for a plaintiff to show disparate treatment, *she must demonstrate "that the misconduct for which she was discharged was **nearly identical to that engaged in by a[n] employee [not within her protected class]** whom [the company] retained." Smith v. Wal–Mart Stores (No. 471)., 891 F.2d 1177, 1180 (5th Cir.1990) (per curiam) (first and second alterations ours, third alteration in original) (quoting Davin v. Delta Air Lines, Inc., 678 F.2d 567, 570 (5th Cir. Unit B 1982)); see Mayberry v. Vought Aircraft Co., 55 F.3d 1086, 1089 (5th Cir.1995); Little v. Republic Ref. Co., 924 F.2d 93, 97 (5th Cir.1991); see also Barnes v. Yellow Freight Sys., Inc., 778 F.2d 1096, 1101 (5th Cir.1985)* ("When a supervisor of one race treats employees of the same race more favorably than similarly situated employees of another race under circumstances that are *essentially identical,* a presumption of discriminatory intent is raised." (emphasis added)). Or put another way, *the conduct*

> *at issue is not nearly identical when the difference between the plaintiff's conduct and that of those alleged to be similarly situated accounts for the difference in treatment received from the employer. See Wyvill v. United Cos. Life Ins. Co.,* 212 F.3d 296, 304–05 (5th Cir.2000) (requiring the plaintiff to show that the company treated others differently in "nearly identical circumstances" and finding that "the striking differences between the two men's situations more than account for the different treatment they received"); *see also Polanco v. City of Austin, Tex.,* 78 F.3d 968, 977 (5th Cir.1996) (where jury had to reject the employer's contention that two employees were not similarly situated, the "evidence had to contradict the legitimacy of the [employer's] explanation that the differences between [the two employees] justified" the difference in treatment).

*Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 221 (5th Cir. 2001) (emphasis added in italics and bold italics).[9] This is an exacting standard—the Fifth Circuit has explained:

> The employment actions being compared will be deemed to have been taken under nearly identical circumstances when the employees being compared ***held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories***. And, critically, the plaintiff's conduct that drew the adverse employment decision must have been "nearly identical" to that of the proffered comparator who allegedly drew dissimilar employment decisions. If the "difference between the plaintiff's conduct and that of those alleged to be similarly situated *accounts for* the difference in treatment received from the employer," the employees are not similarly situated for the purposes of an employment discrimination analysis.

*Lee*, 574 F.3d at 260 (emphasis added in bold italics, footnotes omitted, emphasis in italics in original). "The similarly situated employee is known as a comparator." *Saketkoo v. Administrators*

---

[9] In *Cardiel v. Apache Corporation*, the Fifth Circuit explained:

> employees are generally not similarly situated if they have different supervisors, different work responsibilities, work for different divisions of a company, committed dissimilar violations, or were the subject of adverse employment actions too remote in time from that taken against the plaintiff. *See id.* at 259–60. Furthermore, if the "difference between the plaintiff's conduct and that of those alleged to be similarly situated accounts for the difference in treatment received from the employer, the employees are not similarly situated for the purposes of an employment discrimination analysis." *Id.* at 260 (emphasis in original) (citation and internal quotation marks omitted). In short, an employee who proffers a fellow employee as a comparator must "demonstrate that the employment actions at issue were taken under nearly identical circumstances" for "nearly identical" conduct. *Id.*

*Cardiel v. Apache Corp.*, 559 Fed. Appx. 284, 288 (5th Cir. 2014) (not designated for publication) (citing *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 259-60 (5th Cir. 2009)).

---

MEMORANDUM OPINION AND ORDER

*of Tulane Educ. Fund*, 31 F.4th 990, 998 (5th Cir. 2022) (addressing gender discrimination claim under Title VII).

Edwards asserts there is no evidence of a comparator for Stark to meet this fourth element of her prima facie burden. Stark testifies that "a number of critical care representatives [. . .] banded together and said, you know what, we're not going to take this [. . .] [COVID-19 vaccination]. We're not doing it." (ECF No. 41 at 63). But the record contains no further evidence about these critical care reps: (i) as to their reason(s) for refusing the COVID-19 vaccination, (ii) whether they refused the vaccination due to a religious belief, (iii) whether they were Christian, or (iv) whether they fell under the Mandate. Additionally—Stark testified that (i) the critical care representatives worked in different areas; (ii) were in a different business unit (Critical Care); and (iii) have different leadership and human resources representatives. (ECF No. 41 at 63-66). Stark testified that another employee—Michelle DeHan—requested a medical accommodation, but Stark testified that DeHan was not a sales representative and worked in a different division. (ECF No. 41 at 58-59. Stark testified another employee—Susan Hadley—requested a medical accommodation, but Stark testified (i) Hadley was in a different division—transcatheter heart valves—and (ii) Stark did not know whether Hadley received any accommodation. (ECF No. 41 at 58-59). Stark testified to Lisa Washington as a comparator—working the same position with the same supervisors, but Washington was not treated more favorably. (ECF No. 41 at 50). Similar to Stark, Edwards granted Washington a religious accommodation but ultimately discharged her. The record shows that none of Stark's proffered employees were "similarly situated" and treated differently. *Abarca*, 404 F.3d at 941; *Wallace*, 271 F.3d at 221; *Lee*, 574 F.3d at 259-60. The record further contains no evidence that Edwards treated Stark differently than another similarly situated employee for nearly identical conduct—e.g., refusing to comply with the Mandate's COVID-19

---

vaccination requirement, losing access to customer accounts due to their COVID-19 policies, and failing to secure further work as offered.[10] The Court must conclude Stark has not shown a genuine issue of material fact exists on the fourth element of her disparate treatment claim—regarding a similarly situated employee. Consequently, the Court GRANTS Edwards's motion for summary judgment on Stark's disparate treatment based on religion claim.

## V.    RELIGIOUS DISCRIMINATION

Title VII prohibits an employer from discriminating against an employee on the basis of her religion. *See* 42 U.S.C. §§ 2000e-2(a)(1), 2000e(j). The statute defines "religion" to include "all aspects of religious observance and practice, as well as belief[.]" 42 U.S.C. § 2000e(j). The Fifth Circuit has explained:

> To establish a prima facie case of religious discrimination under Title VII, the plaintiff must present evidence that **(1)** she held a bona fide religious belief, **(2)** her belief conflicted with a requirement of her employment, **(3)** her employer was informed of her belief, and **(4)** she suffered an adverse employment action for failing to comply with the conflicting employment requirement.

*Davis v. Fort Bend Cnty.*, 765 F.3d 480, 485 (5th Cir. 2014) (block quoting *Tagore v. United States,* 735 F.3d 324, 329 (5th Cir. 2013) (citing *Bruff v. N. Miss. Health Servs., Inc.,* 244 F.3d 495, 499 n. 9 (5th Cir. 2001)); *see also, e.g.*, *Weber v. Roadway Exp., Inc.*, 199 F.3d 270, 273 (5th Cir. 2000) (discussing the same four elements). Edwards does not appear to challenge any of the prima facie elements of Stark's religious discrimination claim. (ECF No. 40 at 34-41). Thus, the Court assumes without deciding that Stark has met her prima facie burden as to her religious discrimination claim.

---

[10] Indeed, the closest comparator to Stark is Lisa Washington, who was also discharged.

## VI.    PRETEXT

Assuming *arguendo* Stark has shown a prima facie case (i) of disparate treatment based on religion or (ii) of religious discrimination, the Court moves to the second step of the *McDonnell Douglas* framework—whether Edwards produced a legitimate, nondiscriminatory reason for terminating Stark. *Reeves*, 530 U.S. 133, 142. The summary judgment evidence includes a legitimate, nondiscriminatory reason for terminating Stark's employment. *Owens*, 33 F.4th at 825-27, 835 (discussing pretext in the discrimination and retaliation contexts). Here, Edwards produced evidence of one overarching reason for the termination—Stark refused to comply with the Mandate's COVID-19 vaccination requirement, Stark could not enter several of her customer accounts due to their COVID-19 vaccination policies, and Edwards could not secure further work with Stark. Next, under the third step of the *McDonnell Douglas* framework, Stark must counter this evidence with "substantial evidence" for the termination as pretextual. *See Owens*, 33 F.4th at 825-27; *see also Vaughn v. Woodforest Bank*, 665 F.3d 632, 637 (5th Cir. 2011). For pretext in the discrimination context, the Fifth Circuit has explained:

> The plaintiff must rebut each nondiscriminatory reason articulated by the employer. *Wallace*, 271 F.3d at 220. A plaintiff may establish pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or "unworthy of credence." *Id.*; *Reeves*, 530 U.S. at 143, 120 S.Ct. at 2106. An explanation is false or unworthy of credence if it is not the real reason for the adverse employment action. *See Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 899 (5th Cir. 2002).

*Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003) (addressing discrimination claims under Title VII and the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act of 1978). The Court has already addressed disparate treatment hereabove, and the analysis is the same whether in the disparate treatment claim context or the pretext context. *See, e.g.*, *Normore v. Dallas Indep. Sch. Dist.*, 677 F. Supp. 3d 494, 530 (N.D. Tex. 2023) (discussing disparate treatment in

both the sex-discrimination context and the pretext context). The Court reaches the same determination—no evidence exists in the summary judgment evidence to show disparate treatment. There is no genuine issue of material fact as to disparate treatment in the pretext context.

The Court next addresses whether summary judgment evidence shows Edwards's explanation for the discharge was false or unworthy of credence—such that a genuine issue of material fact exists. As to whether an employer's explanation is false or unworthy of credence— "[an explanation] cannot be proved to be 'a pretext for discrimination' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *Hicks*, 509 U.S. at 515 (emphasis in original). Stark presents no evidence that Edwards's explanation for her termination is false or unworthy of credence. *Laxton*, 333 F.3d at 578; *Hicks*, 509 U.S. at 515. No evidence in the record shows Edwards's reason for the termination was false, and nothing in the record demonstrates any discriminatory animus from Edwards. No evidence shows religion or religious discrimination was the real reason for the separation. To the contrary, the summary judgment evidence suggests Edwards took no issue with Stark's religiosity or Christian faith: (i) several Edwards employees— including her supervisor—knew Stark was Christian; (ii) Stark had been promoted on several occasions and had never been denied any promotion request; and (iii) Burgos never made any disparaging remarks about Stark's religious beliefs.[11] (ECF No. 41 at 29, 55, 56). Although Stark testifies generally that she believed someone at Edwards held "discrimination against Christianity," Stark could not name any person or position who held such discriminatory animus. (ECF No. 41 at 61-62). Nothing in the competent summary judgment evidence shows the decisionmakers in Edwards's termination of Stark held discriminatory animus of any kind. *See Russell*, 235 F.3d at 227 (citing *Santiago–Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46,

---

[11] The record contains no summary judgment evidence that any Edwards employee made disparaging remarks about Stark's religious beliefs.

55 (1st Cir. 2000)); *Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 478 (5th Cir. 2015) (discussing pretext in the context of a decisionmaker that made comments relating to age consequent to an age discrimination claim). No genuine issue of material fact exists to show Edwards's explanation for Stark's discharge was false or unworthy of credence.

Edwards's briefing raises a mixed-motive analysis of pretext. (ECF No. 40 at 37, 55-56). The Fifth Circuit "has adopted use of a 'modified *McDonnell Douglas* approach' in cases where the mixed-motive analysis may apply." *Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 341 (5th Cir. 2005). The modified *McDonnell Douglas* approach differs from the traditional *McDonnell Douglas* approach after (i) the plaintiff has made a prima facie showing and (ii) defendant has responded with a legitimate, nondiscriminatory reason for the adverse employment action. *Keelan*, 407 F.3d at 341.

> [T]he plaintiff must then offer sufficient evidence to create a genuine issue of material fact 'either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) **that the defendant's reason, while true, is only one of the reasons for its conduct, and another "motivating factor" is the plaintiff's protected characteristic (mixed-motive[s] alternative)**.

*Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004) (internal quotation marks and citations omitted) (emphasis added in bold). The *Rachid* Court further recognized:

> "A mixed-motives case arises when an employment decision is based on a mixture of legitimate and illegitimate motives. [. . .] If the employee proves the unlawful reason was a motivating factor, the employer must demonstrate that it would have taken the same action in the absence of the impermissible motivating factor."

*Rachid*, 376 F.3d at 309–10 (quoting *Louis v. E. Baton Rouge Parish Sch. Bd.*, 303 F.Supp.2d 799, 801–04 (M.D. La. 2003)) (citing *Medlock v. Ortho Biotech, Inc.*, 164 F.3d 545, 553 (10th Cir. 1999) (noting that a mixed-motives analysis applies "where the evidence is sufficient to allow a trier to find both forbidden and permissible motives.") (quotations and citations omitted)). As discussed above, the summary judgment evidence contains no evidence of any discriminatory

animus or illegitimate motive from Edwards with regard to the termination. *See Rachid*, 376 F.3d at 309–10. The record contains no competent summary judgment evidence of religious discrimination as a motivating factor in Stark's discharge. Thus, Stark has not met her pretext burden under the mixed-motive analysis.

For those reasons, the Court determines Stark has not met her burden under the third step of the *McDonnell Douglas* framework involving pretext. The summary judgment evidence does not establish a genuine issue of material fact as to this third step, and Stark has not rebutted Edwards's explanation for discharging Stark with "substantial evidence" for the termination as pretextual nor shown any discriminatory mixed-motive. *See Owens*, 33 F.4th at 825; *see also Vaughn*, 665 F.3d at 637. Assuming *arguendo* that Stark met her prima facie burden on her disparate treatment based on religion claim, that claim would fail under the preceding pretext analysis. Similarly, Stark's religious discrimination claim fails under the preceding pretext analysis. The Court GRANTS Edwards's motion for summary judgment on Stark's (i) disparate treatment based on religion claim and (ii) religious discrimination claim.

## VII.    FAILURE TO ACCOMMODATE RELIGIOUS OBSERVANCE

"An employer has the statutory obligation to make reasonable accommodations for the religious observances of its employees, but is not required to incur undue hardship." *Weber*, 199 F.3d at 273. The court analyzes a Title VII claim for a failure to accommodate religious observance under a burden-shifting framework akin to the *McDonnell Douglas* burden shifting framework. *See McDonnell Douglas*, 411 U.S. at 804; *see generally Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996) ("To succeed on a claim of intentional discrimination under Title VII, Section 1983, or Section 1981, a plaintiff must first prove a prima facie case of discrimination.") (collecting cases); *see, e.g., Balderas v. Valdez*, No. 16-CV-2652-D, 2018 WL

3570096, at *2 (N.D. Tex. July 25, 2018) (discussing the same). The employee must first establish a prima facie case of religious discrimination. *Antoine v. First Student, Inc.*, 713 F.3d 824, 831 (5th Cir. 2013).

Once the plaintiff in a religious discrimination case makes out a prima facie case, "the burden shifts to the defendant to demonstrate either [(i)] that it reasonably accommodated the employee, or [(ii)] that it was unable to reasonably accommodate the employee's needs without undue hardship." *Antoine*, 713 F.3d at 831. Because Edwards will have the burden of proving undue hardship at trial, to obtain summary judgment, it "must demonstrate, without genuine and material factual dispute, and as a matter of law, that [Edwards was] unable to reasonably accommodate [Stark's] religious beliefs without incurring undue hardship." *Ford v. City of Dallas, Tex.*, 2007 WL 2051016, at *1 (N.D. Tex. July 12, 2007). "[U]ndue hardship is shown when a burden is substantial in the overall context of an employer's business." *Groff v. DeJoy*, 600 U.S. 447, 468 (2023) (quotation marks omitted). The Court next addresses the challenged elements of Stark's prima facie case and whether Edwards met the second step of this failure to accommodate analysis.

### A. Whether Stark Held a Bona Fide Religious Belief

On her failure to accommodate religious practice claim, Edwards challenges the first element of her required religious discrimination prima facie case—whether Stark held a bona fide religious belief. *See Davis*, 765 F.3d at 485. The Fifth Circuit has explained that:

> Bona fide religious beliefs include "moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious views." *See, e.g.,* 29 C.F.R. § 1605.1 (citing *United States v. Seeger,* 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965)). **A court's inquiry is limited to focusing upon the individual's motivation. Specifically, a court's task is to decide "whether [the individual's beliefs] are, *in his own scheme of things,* religious."** *Seeger,* 380 U.S. at 185, 85 S.Ct. 850 (emphasis added). In this regard, a belief is "religious" if it is "[a] sincere and meaningful belief which occupies in the life of its possessor a

place parallel to that filled by ... God." *Seeger,* 380 U.S. at 176, 85 S.Ct. 850. Conversely, whether the belief itself is central to the religion, i.e., whether the belief is a true religious tenet, is "not open to question." *Moussazadeh v. Tex. Dep't of Criminal Justice,* 703 F.3d 781, 790 (5th Cir.2012) (quoting *Seeger,* 380 U.S. at 185, 85 S.Ct. 850) (internal quotation marks omitted) (discussing the threshold inquiry into a person's religious belief under the Religious Land Use and Institutionalized Persons Act); *see Tagore,* 735 F.3d at 328–29 (applying *Moussazadeh* to a Title VII religious discrimination claim).

**The sincerity of a person's religious belief is a question of fact unique to each case. *Tagore,* 735 F.3d at 328; *Moussazadeh,* 703 F.3d at 791 ("This is doubly true regarding sincerity.").** "The specific religious practice must be examined rather than the general scope of applicable religious tenets, and the plaintiff's 'sincerity' in espousing that practice is largely a matter of individual credibility." *Tagore,* 735 F.3d at 328; *see also Moussazadeh,* 703 F.3d at 791 ("[T]he important inquiry was what the prisoner claimed was important to him." (alteration in original) (citation and internal quotation marks omitted)).

**This court has cautioned that judicial inquiry into the sincerity of a person's religious belief "must be handled with a light touch, or judicial shyness." *Tagore,* 735 F.3d at 328 (citation and internal quotation marks omitted).** "[E]xamin[ing] religious convictions any more deeply would stray into the realm of religious inquiry, an area into which we are forbidden to tread." *Id.* (alteration in original) (citation and internal quotation marks omitted). Indeed, "the sincerity of a plaintiff's engagement in a particular religious practice is rarely challenged," and "claims of sincere religious belief in a particular practice have been accepted on little more than the plaintiff's credible assertions." *Id.*

*Davis*, 765 F.3d at 485–86 (emphasis added in bold).

Edwards asserts that evidence that a plaintiff has acted "inconsistently with her stated religious beliefs is evidence the religious observances 'are based on [her] personal preferences and not a sincerely held religious belief.'" (ECF No. 40 at 43) (citing *Lorenz v. Wal-Mart Stores, Inc.*, No. SA05CA0319 OG (NN), 2006 WL 1562235, at *9 (W.D. Tex. May 24, 2006), *subsequently aff'd sub nom. Lorenz v. Wal-Mart Stores*, 225 Fed. Appx. 302 (5th Cir. 2007). The summary judgment evidence shows that in October of 2021, Stark sought a religious exemption from having to take the annual influenza vaccine and the COVID-19 vaccine. (ECF No. 41 at 155). However, the summary judgment evidence also shows Stark submitted to several vaccinations in the past

(including for annual influenza) because she thought she "needed them." (ECF No. 41 at 79-80, 157). As shown above, Stark testified as to her religious beliefs in the context of the COVID-19 vaccine. (ECF No. 41 at 26-27).

The Court declines to conduct an inquiry as to the sincerity of Stark's religious beliefs regarding the COVID-19 vaccination. *Davis*, 765 F.3d at 485–86. The Court assumes without deciding that Stark held a bona fide religious belief that prohibited her from submitting to the COVID-19 vaccination requirement of the Second Mandate. Edwards does not challenge any other element of Stark's prima facie showing of religious discrimination in its argument on Stark's failure to accommodate religious observance claim. (*See generally* ECF Nos. 40; 48). The Court determines that in the context of a failure to accommodate a religious observance claim, Stark has made a prima facie case of religious discrimination. *Antoine*, 713 F.3d at 831.

### B. Whether Edwards Reasonably Accommodated Stark

Edwards next asserts it reasonably accommodated Stark's refusal to receive a COVID-19 vaccination under the Mandate, after Stark's customer accounts implemented their own COVID-19 vaccination policies. The Fifth Circuit has explained:

> "An employer has the statutory obligation to make reasonable accommodations for the religious observances of its employees, but it is not required to incur undue hardship." *Weber v. Roadway Exp., Inc.*, 199 F.3d 270, 273 (5th Cir. 2000). "Title VII does not restrict an employer to only those means of accommodation that are preferred by the employee." *Bruff v. N. Miss. Health Servs., Inc.*, 244 F.3d 495, 501 (5th Cir. 2001). **Once an employer has established that it offered a reasonable accommodation, even if that alternative is not the employee's preference, it has satisfied its obligation under Title VII as a matter of law.** *Id.* **The employer's offer of a reasonable accommodation triggers an accompanying duty for the employee: "An employee has a duty to cooperate in achieving accommodation of his or her religious beliefs, and must be flexible in achieving that end."** *Id.* **at 503.**

*Horvath v. City of Leander*, 946 F.3d 787, 791 (5th Cir. 2020), as revised (Jan. 13, 2020) (emphasis added in bold). A plaintiff has the "burden of establishing that reasonable accommodation is

possible[.]" *Chandler v. City of Dallas*, 2 F.3d 1385, 1395 (5th Cir. 1993), *holding modified by Kapche v. City of San Antonio*, 304 F.3d 493 (5th Cir. 2002). "[T]he employee's duty, inherent in the employment relationship, to attempt to accommodate [her] beliefs himself and to cooperate with attempts at reasonable accommodation by [her] employer." *Brener v. Diagnostic Ctr. Hosp.*, 671 F.2d 141, 145 (5th Cir. 1982) (internal quotation omitted) (discussing religious discrimination claim).[12]

Edwards asserts that it met its Title VII obligation to make a reasonable accommodation of Stark's religious belief when it offered her assistance in finding another position at Edwards that would not conflict with her religious observance under the Mandate. The summary judgment evidence shows Edwards: (i) granted Stark's accommodation request, (ECF No. 41 at 158-62); (ii) offered assistance in finding further work after Stark's customer accounts implemented COVID-19 vaccination policies that conflicted with Stark's religious observances, (ECF No. 41 at 176); (iii) evaluated Stark's resignation and accepted consequent withdrawal of the same (ECF No. 41 at 53, 192-93); (iv) repeatedly offered Stark assistance in securing further work, (ECF No. 41 at 192); and (v) evaluated Stark's November 14, 2021 accommodation proposal up to the date of her discharge, (ECF No. 41 at 19-21, 196-97). Although Stark testified she looked for other roles that would afford her further work, the summary judgment evidence shows Stark did not identify any roles with Edwards. (ECF No. 41 at 51-53). Edwards directs the Court to *Bruff v.*

---

[12] The Fifth Circuit further explained:

> cases confirm what the statute's use of the term "reasonable" suggests: ***bilateral cooperation is appropriate in the search for an acceptable reconciliation of the needs of the employee's religion and the exigencies of the employer's business***. Although the statutory burden to accommodate rests with the employer, the employee has a correlative duty to make a good faith attempt to satisfy his needs through means offered by the employer. ***A reasonable accommodation need not be on the employee's terms only***.

*Brener v. Diagnostic Ctr. Hosp.*, 671 F.2d 141, 145–46 (5th Cir. 1982) (emphasis added in bold italics).

*North Mississippi Health Services, Incorporated* in arguing that its actions of offering and assisting Stark with further work constituted a reasonable accommodation. 244 F.3d at 501-03. In *Bruff* the Fifth Circuit addressed a failure to accommodate religious observance claim raised under Title VII. The *Bruff* employer gave the employee:

> 30 days, and the assistance of its in-house employment counselor, to find another position at the Center where the likelihood of encountering further conflicts with her religious beliefs would be reduced fulfilled its obligations to offer her a reasonable accommodation.
> [. . .]
> When the Medical Center gave Bruff 30 days to find another position, it also alerted its in-house employment counselor to the situation and directed that Bruff be given assistance in that effort.[] The record reflects that Bruff was advised of, and applied for, another counselor position. Although she was not successful, the Medical Center was not obligated to give Bruff preference over others with superior credentials when filling the Psychiatric Assessment Counselor position.

244 F.3d at 501 (footnote omitted). The *Bruff* Court determined the employer had made a reasonable accommodation to that employee. 244 F.3d at 503.

In her testimony, Stark avers that Edwards failed to act in "good faith" in helping her to find another job. (ECF No. 41 at 53). However, no Party directs the Court to a "good faith" requirement for a reasonable accommodation of religious beliefs under Title VII, and the Court has found none. Otherwise, the summary judgment evidence shows Edwards refused to meet her preference(s) in work accommodation—which Edwards was not required to afford as the *only* reasonable accommodation. *Horvath*, 946 F.3d at 791; (*see* ECF No. 69 at 79-80; 87).

The Court must conclude that—as in *Bruff*—Edwards has shown that it offered a reasonable accommodation to Stark in offering and assisting Stark in securing further work. 244 F.3d at 503. The summary judgment evidence does not show a genuine issue of material fact as to whether Edwards reasonably accommodated Stark's religious belief. Edwards has met its statutory burden under Title VII as a matter of law. *Horvath*, 946 F.3d at 791; *Ansonia Bd. of Educ. v.*

*Philbrook*, 479 U.S. 60, 68 (1986) ("[W]here the employer has already reasonably accommodated the employee's religious needs, the statutory inquiry is at an end.").[13] The Court GRANTS Edwards's motion for summary judgment on Stark's failure to accommodate religious observance claim.

### C. Whether Edwards Has Shown Undue Hardship on the Conduct of its Business

Assuming *arguendo* Edwards had not reasonably accommodated Stark's religious observance, the Court next considers whether Edwards has shown undue hardship on the conduct of its business. Edwards refers the Court to the Supreme Court's opinion in *Groff v. DeJoy* in its argument that it met the undue hardship requirement under Title VII. 600 U.S. at 468. In *Groff*, the Supreme Court explained:

> **Here, the key statutory term is "undue hardship." In common parlance, a "hardship" is, at a minimum, "something hard to bear."** Random House Dictionary of the English Language 646 (1966) (Random House). Other definitions go further. See, *e.g.*, Webster's Third New International Dictionary 1033 (1971) (Webster's Third) ("something that causes or entails suffering or privation"); American Heritage Dictionary 601 (1969) (American Heritage) ("[e]xtreme privation; adversity; suffering"); Black's Law Dictionary, at 646 ("privation, suffering, adversity"). But under any definition, a hardship is more severe than a mere burden. So even if Title VII said only that an employer need not be made to suffer a "hardship," an employer could not escape liability simply by showing that an accommodation would impose some sort of additional costs. Those costs would have to rise to the level of hardship, and adding the modifier "undue" means that the requisite burden, privation, or adversity must rise to an "excessive" or "unjustifiable" level. Random House 1547; see, *e.g.*, Webster's Third 2492 ("inappropriate," "unsuited," or "exceeding or violating propriety or fitness"); American Heritage 1398 ("excessive"). The Government agrees, noting that "'undue hardship means something greater than hardship.'" Brief for United States 30; see *id.*, at 39 (arguing that "accommodations should be assessed while 'keep[ing] in mind both words in the key phrase of the actual statutory text: "undue" and "hardship"'" (quoting *Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 456 (C.A.7 2013)).

---

[13] *See generally Hebrew v. Tex. Dep't of Criminal Justice*, 80 F.4th 717, 723 (5th Cir. 2023) (explaining no reasonable accommodation was made to employee's religious observance of keeping a long beard). The Court notes that, unlike in *Hebrew*—where the Fifth Circuit discussed, *inter alia*, an employer's avoidance of an accommodation— Edwards actively supported the accommodation of offering further work over several weeks and repeated efforts. *Compare Hebrew*, 80 F.4th at 723 *with Bruff v. N. Miss. Health Servs., Inc.,* 244 F.3d 495, 501-03 (5th Cir. 2001).

[. . . .]
**[C]ourts must apply the test in a manner that takes into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, "size and operating cost of [an] employer."**
[. . . .]
**we think it appropriate to leave it to the lower courts to apply our clarified context-specific standard, and to decide whether any further factual development is needed.**

600 U.S. at 468-71, 473 (emphasis added in bold).

As shown above, Edwards implemented and evaluated this Mandate as a method to protect its patient and healthcare worker customers from COVID-19 by reducing its spread. (ECF No. 41 at 115, 123, 147). This Court has entered opinions relating to COVID-19 and respective employment accommodations to work mandates or exemptions in two of its prior cases and takes judicial notice of the same. *Sanchez v. Brown*, No. 3:20-CV-00832-E, 2020 WL 2615931 (N.D. Tex. May 22, 2020) (addressing spread of COVID-19 inside the Dallas County Jail in the context of various 42 U.S.C. § 1983 claims); *Hicks v. Baylor Univ. Med. Ctr. Dallas*, No. 3:22-CV-00072-E, 2024 WL 3513471 (N.D. Tex. July 22, 2024) (addressing employment accommodation(s) under the ADA in the context of a COVID-19 exemption). The summary judgment evidence shows that permitting Stark to continue work would have conflicted with the COVID-19 policies of seven of her 32 customer accounts—that is, Stark would not be able to enter about 22% of her assigned customer accounts. (ECF No. 41 at 124-25). The summary judgment evidence shows (i) no one could replace Stark in her specific role and (ii) that Stark's proposal involving the lesser-experienced Johnson could risk the health of Edwards's customers. (ECF No. 41 at 144-46, 196). Given the context of Edwards—a medical device merchant whose employees interact with (i) at-risk patients and (ii) healthcare workers—and its customers' COVID-19 vaccination policies, the Court determines that the summary judgment evidence shows undue hardship on the conduct of

Edwards's business.[14] The Court GRANTS Edwards's motion for summary judgment on Stark's failure to accommodate religious observance claim.

## VIII.  Motion to Strike

Edwards has objected to and moved to strike several portions of Stark's submitted appendix. (ECF No. 47). As one court in the Northern District has discussed in the context of a motion to strike summary judgment evidence:

> Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Eason v. Thaler,* 73 F.3d 1322, 1325 (5th Cir.1996). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *See Forsyth v. Barr,* 19 F.3d 1527, 1533 (5th Cir.), *cert. denied,* 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994). . . . . "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Disputed fact issues which are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548.

*Appel v. Inspire Pharms., Inc.*, 712 F. Supp. 2d 538, 542 (N.D. Tex. 2010), *aff'd*, 428 F. App'x 279 (5th Cir. 2011). As another court in the Northern District has discussed in determining summary judgment:

> The court in deciding [movant's] motion will not take into account summary judgment evidence that [movant] has not cited in the manner required—that is, to each page of the appendix that supports each assertion that the party makes concerning the evidence. "Otherwise, [Rule 56.5(c)] would not mean what [it] say[s]." *See Andrews v. CompUSA, Inc.,* 2002 WL 265089, at *3 (N.D.Tex. Feb.21,

---

[14] *See generally Hebrew v. Tex. Dep't of Criminal Justice,* 80 F.4th 717, 722-23 (5th Cir. 2023) ("TDCJ nowhere identifies any actual costs it will face—much less "substantial increased costs" affecting its entire business—if it grants this one accommodation [allowing an employee to keep a long beard].").

2002)( Fitzwater, J.). The court will not undertake a search of the appendix for evidence that would be sufficient to grant summary judgment in [movant's] favor.

> The court is not required to "comb the record" in search of summary judgment evidence. *See Doddy v. Oxy USA, Inc.,* 101 F.3d 448, 463 (5th Cir.1996) (citing *Jones v. Sheehan, Young & Culp, P.C.,* 82 F.3d 1334, 1338 (5th Cir.1996)). "Nor will the court overlook Rule 56.5(c), a valuable tool for busy trial courts that requires a party to place an issue clearly in focus by citing in its brief *each* page of the appendix that supports *each* assertion that it makes concerning the summary judgment evidence." *Andrews,* 2002 WL 265089 at *3.

*Aspex Eyewear, Inc. v. E'Lite Optik, Inc.*, No. CIV.A. 398CV2996D, 2002 WL 1751381, at *9 (N.D. Tex. Apr. 4, 2002). This Court agrees with the *Appel* and *Aspex Eyewear, Inc.* Courts' reasoning and applies the same standards to the Parties in this case. *See Appel*, 712 F. Supp. 2d at 542; *Aspex Eyewear*, 2002 WL 1751381, at *9. The Court has not considered any evidence that did not meet these standards. The Court DENIES the motion to strike. (ECF No. 47). As the Court has considered all of the competent summary judgment evidence before it—without striking any evidence—there is no evidence that shows a genuine issue of material fact exists in support of Stark's claims. That is, even without striking evidence, nothing in the record creates a genuine issue of material fact that would preclude Edwards's motion for summary judgment.

## IX. MOTION FOR SANCTIONS

Edwards has moved to sanction Stark and her Counsel—Frank Hill, Anne Michels, and Stefanie Klein—pursuant to Federal Rule of Civil Procedure 11 and to sanction Stark's Counsel pursuant to 28 U.S.C. § 1927. (ECF No. 50). These same counsel represent similar parties in an earlier-filed case—*Washington v. Edwards Lifesciences LLC*, No. 3:22-cv-02565-E. In *Washington*, (i) Hill, Michels, and Klein represent a former employee of Edwards named Lisa Washington, who appears to be similarly situated to Stark, and (ii) Theanna Bezney (*inter alia*) represents Edwards. Edwards's motion for sanctions relates to the correspondences between counsel in the interim period between the *Washington* summary judgment response and Stark's

---

summary judgment response. (*See* ECF No. 50). In both cases, each Plaintiff withdrew all of their claims except for those relating to religious discrimination and failure to accommodate religious observance in response to Edwards's summary judgment motion(s). *See Washington*, No. 3:22-cv-02565-E, ECF No. 74 at 9; (ECF No. 45 at 10).

Edwards's briefing avers:

On February 22, 2024, Washington filed her response to Edwards's dispositive motion, wherein she voluntarily withdrew her claims for age discrimination, retaliation, and breach of contract. []

The following day, Defendant's counsel, Theanna Bezney ("Mrs. Bezney") spoke with Mr. Hill via telephone, advising him that Edwards planned to file a similar dispositive motion in this case and inquiring as to whether Stark would also be withdrawing her claims for age discrimination and retaliation. [] Mrs. Bezney noted such inquiry was made in an attempt to avoid unnecessarily briefing claims Plaintiff did not intend to pursue and thereby wasting the parties' and the Court's time and resources. []

Mr. Hill advised he would confer with Stark and let Mrs. Bezney know. []

The following week, Mrs. Bezney emailed Mr. Hill, again asking whether Stark intended to dismiss any claims ahead of the parties' dispositive motion deadline. [] Mr. Hill responded, "Will check." []

On February 28, 2024, Mrs. Bezney conferred via telephone with Ms. Michels and, later that day, with Mr. Hill, yet again asking whether Stark was planning to waive her age discrimination and retaliation claims. []

Neither Ms. Michels nor Mr. Hill provided a substantive response to such inquiries. [] Plaintiff had not notified Defendant of any intention to dismiss any of her claims by the dispositive motion deadline of March 11, 2024.
[. . . .]
Defendant filed a Traditional and No-Evidence Motion for Summary Judgment on March 11, 2024, seeking judgment in its favor as to all of Plaintiff's claims.

(ECF No. 50 at 5-6) (citations omitted).

In summary, Edwards moves to sanction Stark, Hill, Michels, and Klein because they did not inform Edwards that Stark intended to withdraw several of her claims. (ECF No. 50 at 1)

---

("Plaintiff and her counsel be sanctioned for needlessly and intentionally diving up the cost of this litigation in connection with Defendant's pending Motion for Summary Judgment.").

In response, Hill explains he "simply forgot to follow up with Defendant's counsel." (ECF No. 56 at 14). Stark otherwise asserts the motion for sanctions (i) is defective because it contains no certificate of conference;[15] (ii) is improper as to Stark as she is not an attorney signing a document under Rule 11;[16] and (iii) fails because—under 28 U.S.C. § 1927[17]—Stark's counsel did not unreasonably or vexatiously multiply the proceedings in this lawsuit. (ECF No. 56).

The Court DENIES the motion for sanctions on two independent bases. First, the motion for sanctions lacks the required certificate of conference. N.D. Tex. Loc. Civ. R. 7.1. Second, the Court determines Stark's Counsel's conduct does not constitute sanctionable conduct. However, Stark's Counsel's conduct does concern the Court. The Court reminds the Parties and all counsel of the standards of practice that the Northern District of Texas adopted in *Dondi Properties Corporation v. Commerce Savings & Loan Association*:

> (A) In fulfilling his or her primary duty to the client, a lawyer must be ever conscious of the broader duty to the judicial system that serves both attorney and client.
> (B) A lawyer owes, to the judiciary, candor, diligence and utmost respect.
> (C) A lawyer owes, to opposing counsel, a duty of courtesy and cooperation, the observance of which is necessary for the efficient administration of our system of justice and the respect of the public it serves.
> (D) A lawyer unquestionably owes, to the administration of justice, the fundamental duties of personal dignity and professional integrity.
> (E) Lawyers should treat each other, the opposing party, the court, and members of the court staff with courtesy and civility and conduct themselves in a professional manner at all times.

---

[15] *See* N.D. Tex. Loc. Civ. R. 7.1 (requiring conference for certain motions, including those for sanctions).

[16] Fed. R. Civ. P. 11(c) (enumerating sanctions practice).

[17] "Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927.

(F) A client has no right to demand that counsel abuse the opposite party or indulge in offensive conduct. A lawyer shall always treat adverse witnesses and suitors with fairness and due consideration.

(G) In adversary proceedings, clients are litigants and though ill feeling may exist between clients, such ill feeling should not influence a lawyer's conduct, attitude, or demeanor towards opposing lawyers.

(H) A lawyer should not use any form of discovery, or the scheduling of discovery, as a means of harassing opposing counsel or counsel's client.

(I) Lawyers will be punctual in communications with others and in honoring scheduled appearances, and will recognize that neglect and tardiness are demeaning to the lawyer and to the judicial system.

(J) If a fellow member of the Bar makes a just request for cooperation, or seeks scheduling accommodation, a lawyer will not arbitrarily or unreasonably withhold consent.

(K) Effective advocacy does not require antagonistic or obnoxious behavior and members of the Bar will adhere to the higher standard of conduct which judges, lawyers, clients, and the public may rightfully expect.

121 F.R.D. 284, 287–88 (N.D. Tex. 1988). Although the Court has not considered any sanction against Stark or her Counsel, the Court nevertheless cautions attorneys practicing in this District to comport (i) with *Dondi* and (ii) with the briefing requirements of the Federal Rules of Civil Procedure, Northern District's Local Rules, and respective judge's policies and procedures. The Court warns Parties that failure to comply with *Dondi* and briefing requirements could result in sanction.

## X. Conclusion

Stark has withdrawn all of her claims except for those involving (i) religious discrimination—which the Court addresses as both a disparate treatment based on religion claim and a religious discrimination claim—and (ii) failure to accommodate religious observance. (ECF No. 45 at 10). For the reasons enumerated above, the Court GRANTS Edwards's motion for summary judgment on all of Stark's remaining claims. (ECF Nos. 39-41). The Court DENIES Edwards's motion to strike.  (ECF No. 47). The Court DENIES Edwards's motion for sanctions. (ECF No. 50). The Court DENIES Stark's motion for leave to file sur-reply. (ECF No. 52). The

Court DISMISSES all of Stark's claims. The Court shall follow with a final judgment. *See* Fed. R.

Civ. P. 54; Fed. R. Civ. P. 58.

**SO ORDERED.**

13th day of February, 2025.

ADA BROWN
UNITED STATES DISTRICT JUDGE